IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
Statesville Division

| | |
|---|---|
| Frank Falzone,<br><br>    Plaintiff,<br> v.<br><br>Town of Mooresville, North Carolina;<br>Chief Ron Campurciani, in his official and individual<br>capacities; Tracey Jerome, in her official and<br>individual capacities; Chris Carney, in his individual<br>capacity;<br><br>    Defendants. | CASE NO.: _____ |

## <u>COMPLAINT AND JURY DEMAND</u>

### Introduction

1. This is a civil rights, whistleblower retaliation, and wrongful discharge action arising from a deliberate and coordinated campaign by senior officials of the Town of Mooresville to silence, discredit, and remove a high-ranking law enforcement officer who refused to participate in or remain silent about serious governmental misconduct involving both the Town's Mayor and the Chief of Police, as well as the efforts of senior Town leadership to conceal that misconduct.

2. Plaintiff Frank Falzone is a veteran law enforcement officer who devoted approximately 28.5 years to the Mooresville Police Department ("MPD"), rising through the ranks to become Assistant Chief of Police, one of the Department's highest command positions. Throughout his career, Falzone was entrusted with significant supervisory authority, internal affairs responsibilities, policy enforcement duties, and the obligation to safeguard the integrity of

MPD and the public's trust. Until the events giving rise to this lawsuit, Falzone's career was defined by professionalism, integrity, and dedicated public service.

3. This case arises after Falzone reported, escalated, and attempted to ensure the proper investigation of two separate but interrelated incidents involving Mayor Chris Carney and the subsequent actions of Police Chief Ron Campurciani, each of which implicated public safety, misuse of governmental authority, and the integrity of police operations:

    a. an after-hours incident at Mooresville Town Hall involving the Mayor's presence inside a secured municipal building with another person, triggering security alarms, and the subsequent suppression, minimization, and mishandling of surveillance footage, access-control data, alarm records, and related security evidence by Town and police leadership; and

    b. a late-night traffic stop involving the Mayor during which a responding officer manually activated his body-worn camera and electronic metadata was generated reflecting activation and deactivation, but no usable recording was captured, and the encounter was misclassified in CAD records and handled in a manner inconsistent with ordinary traffic-stop and supervisory protocols and under the direction and control of senior police leadership; and

    c. the concentration of extraordinary administrative authority in Chief Campurciani, including his appointment as Assistant Town Manager while continuing to serve as Chief of Police (effective on or about June 24, 2024), thereby collapsing the separation between police operations and Town administrative control over departments and systems relevant to records, evidence, and municipal operations as these incidents later surfaced.

4. In each incident, Falzone identified objective electronic evidence, including CAD records, body-worn camera metadata and audit data, access-control logs, alarm data, and surveillance footage, that should have existed and been preserved or properly classified, but which was instead missing, misclassified, incomplete, or rendered inaccessible under the supervision of senior officials.

5. Rather than investigate the Mayor's conduct or address the serious irregularities Falzone identified, many of which directly implicated the Police Chief's supervisory and administrative responsibilities, Defendants turned the machinery of government inward. Senior Town officials and MPD leadership weaponized internal affairs processes, resurrected long-resolved complaints, manipulated investigative pathways, coordinated reputational attacks, restricted Falzone's authority, and isolated him professionally, all for the purpose of punishing Falzone for speaking out and deterring further disclosure of misconduct within Town government and the Police Department.

6. The retaliation intensified after Falzone sought outside legal guidance and made protected disclosures to the town attorney and human resources regarding the suspected cover-up and misuse of authority. In rapid succession, Falzone was stripped of meaningful command authority, placed on administrative leave, publicly stigmatized through false and misleading allegations, and subjected to an investigation designed not to uncover the truth, but to manufacture justification for his removal.

7. Ultimately, Defendants forced Falzone into involuntary retirement under threat of pension loss, depriving him of his career, reputation, and livelihood. This constructive discharge occurred without due process, without a neutral or fair hearing, without any meaningful opportunity to clear his name, and without a pre-deprivation hearing before a neutral

decision-maker, in violation of the First and Fourteenth Amendments to the United States Constitution.

8. Defendants' conduct was not isolated, accidental, or the result of rogue actors. It reflected a pattern, practice, and municipal custom within the Town of Mooresville: protect politically connected officials and senior command staff, suppress inconvenient evidence, and retaliate against those, particularly trusted insiders, who insist on transparency, lawful process, and accountability. This lawsuit seeks to hold Defendants accountable for that pattern and for the constitutional injuries inflicted upon Frank Falzone.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims asserted herein arise under the Constitution and laws of the United States, including but not limited to the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

10. This Court has further jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) and (a)(4), as this action seeks to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution and laws of the United States, and to secure equitable and other relief authorized by federal civil rights statutes.

11. At all relevant times, Defendants acted under color of the statutes, ordinances, regulations, customs, policies, and usages of the State of North Carolina and the Town of Mooresville, and within the scope or apparent scope of their official duties and authority as municipal officials, supervisors, policymakers, and law enforcement officers.

12. This Court has supplemental jurisdiction over Plaintiff's related state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims in this action that they form part of the same case or controversy within the meaning of Article III of the

United States Constitution. The state-law claims arise from the same nucleus of operative facts as Plaintiff's federal constitutional claims, including Defendants' retaliatory conduct, misuse of internal investigative processes, and Plaintiff's forced retirement.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants reside in this District, and because a substantial part of the events, omissions, and injuries giving rise to Plaintiff's claims occurred within Iredell County, North Carolina, which lies within this judicial District.

14. Specifically, the acts and omissions underlying Plaintiff's claims, including protected whistleblower disclosures, retaliatory internal affairs investigations, administrative employment actions, suppression and manipulation of evidence, coercive placement on administrative leave, and Plaintiff's constructive discharge, occurred in or were directed from the Town of Mooresville and the Mooresville Police Department within this District.

15. Venue is further proper because relevant municipal records, internal affairs files, electronic evidence, body-worn camera data, access-control and surveillance records, and witnesses with knowledge of the facts alleged herein are located in this District, and the Defendants regularly conduct official business within this District.

## PARTIES

16. Plaintiff Frank Falzone is a resident of North Carolina and a former Assistant Chief of Police with the Mooresville Police Department. Falzone served the Town of Mooresville in a command-level law enforcement role for more than two decades and was responsible for supervisory, administrative, and internal oversight functions within the Department.

17. Defendant Town of Mooresville is a North Carolina municipal corporation responsible for the policies, customs, practices, training, supervision, and discipline of its police department and municipal employees. At all relevant times, the Town exercised authority over

employment decisions, internal investigations, and disciplinary actions affecting command-level officers.

18. Defendant Tracey Jerome is the Town Manager of Mooresville and a final policymaker with authority over personnel decisions, investigations, and discipline. In that capacity, she participated in, approved, or ratified the actions complained of herein. She is sued in her official capacity for purposes of municipal liability and in her individual capacity for actions taken under color of state law.

19. Defendant Ron Campurciani is the Chief of Police of the Mooresville Police Department and also serves as Assistant Town Manager. He exercised direct supervisory authority over Falzone and played a central role in internal affairs and disciplinary processes. Campurciani participated personally in the retaliatory acts alleged herein. He is sued in his official and individual capacities. Chief Campurciani's additional Assistant Town Manager duties became effective June 24, 2024, and included oversight of E-911 Communications, Building, Permitting and Inspections, and Facilities and Asset Management.

20. Defendant Chris Carney was at all relevant times the Mayor of Mooresville. Although not Plaintiff's direct supervisor, Carney exercised significant influence over Town leadership and senior police command staff. He is sued in his individual capacity for his role in initiating, benefiting from, and participating in the retaliatory scheme alleged herein. Carney personally benefited from the suppression of evidence and abandonment of ordinary investigative protocols concerning incidents in which he was involved.

## FACTUAL ALLEGATIONS

### A. Falzone's Career, Rank, and Responsibilities

21. Falzone began his career with the Mooresville Police Department ("MPD") in approximately 1996 and served the Town of Mooresville continuously for nearly three decades. Over that

time, he held a wide range of operational, supervisory, and command-level assignments, developing deep institutional knowledge of MPD's policies, personnel, internal accountability systems, and operational practices.

22. Through consistent performance, professional judgment, and demonstrated leadership, Falzone earned promotions and commendations and ultimately attained the rank of Assistant Chief of Police, one of the highest command positions within MPD. As Assistant Chief, Falzone was a member of the Department's senior leadership team and routinely interacted with the Chief of Police, the Town Manager, elected officials, and external agencies.

23. In his role as Assistant Chief, Falzone exercised command-level supervision over sworn officers and command staff, enforced and interpreted departmental policies and general orders, oversaw internal affairs investigations and disciplinary matters, reviewed citizen complaints, safeguarded departmental evidence and electronic records, and ensured that MPD operations complied with constitutional policing standards, ethical requirements, and public accountability obligations.

24. Falzone's responsibilities included ensuring compliance with body-worn camera policy, CAD classification standards, evidence retention requirements, and internal affairs integrity.

25. Prior to the events giving rise to this action, Falzone had no disciplinary history warranting termination, demotion, or forced retirement. He was widely regarded within MPD and the Town as a principled, experienced, and trustworthy senior officer, and he had never been accused of dishonesty, misconduct, or abuse of authority.

**B. The Mayor's Traffic Stop and Missing Body-Worn Camera Evidence**

26. In December 2024, Falzone was confidentially approached by Captain Russell Clark, a supervisory officer within MPD, who reported witnessing and participating in a late-night traffic stop involving Mayor Chris Carney.

27. Clark informed Falzone that the stop occurred at approximately 11:23 p.m. on January 30, 2024. Clark initially believed he was assisting another agency, but upon approaching the scene, he realized that the stop involved Mayor Carney and that Chief of Police Ron Campurciani was present at the scene.

28. Clark further informed Falzone that he activated his body-worn camera during the encounter, as required by departmental policy, and that he observed behavior and circumstances suggesting the Mayor may have been impaired, and that Chief Campurciani was present at and exercised supervisory control over the handling of the encounter.

29. Falzone undertook efforts to verify Clark's account through official records. Those efforts revealed that the corresponding CAD entry was classified as an "assist public" rather than a traffic stop or assist to another agency, deviating from standard practice and obscuring the true nature of the encounter.

30. Falzone also learned that no usable body-worn camera recording corresponding to the incident existed within the Axon evidence system, despite electronic metadata confirming that Clark manually activated and deactivated his camera during the relevant time period.

31. The absence of a recording was inconsistent with departmental expectations for traffic stops and supervisor-involved encounters and raised immediate concerns regarding evidence integrity, supervisory oversight, and record accuracy.

32. Subsequent inquiry revealed evidence of a missing and/or anomalous recording log associated with the activation event, further reinforcing that the encounter was not documented or preserved in accordance with policy.

33. Based on the misclassification of CAD records, the absence of a usable recording, the anomalous metadata, and the involvement of senior leadership, Falzone reasonably suspected that these discrepancies were not accidental but reflected intentional manipulation or suppression of records designed to shield the Mayor from scrutiny and conceal the true nature of the encounter.

**C. The Town Hall After-Hours Incident**

34. On or about October 2024, Falzone became aware of reports that Mayor Carney had been inside Mooresville Town Hall after normal business hours, accompanied by a woman whose affiliation with the Town was not known to Falzone. Falzone's concern centered on officer safety and security protocol: officers had responded to Town Hall due to an alarm activation, and the presence of individuals inside the building raised issues regarding access authorization and whether responding officers were permitted and supported to adequately investigate alarm calls. Falzone did not immediately initiate an investigation and instead monitored the matter through approximately December 2024 to determine how Town leadership and the Police Department would address the incident and whether ordinary security and reporting procedures would be followed.

35. The incident occurred inside a secured municipal building after hours and triggered security alarms, prompting a police response. The presence of the Mayor inside Town Hall under those circumstances immediately raised concerns regarding building security, authorization to access municipal facilities, and adherence to proper police response protocols.

36. Upon information and belief, responding officers were dispatched to Mooresville Town Hall in response to the alarm activation. The extent of any contact between responding officers and Mayor Carney is presently unknown to Plaintiff. Plaintiff is informed and believes that responding officers may have made contact with Mayor Carney and may have entered

information into the CAD system; however, any such entries were later miscategorized, altered, or not maintained in a manner reflecting a potential security or access-control incident.

37. At the time of the incident, surveillance footage, electronic access-control logs, and alarm data existed documenting the Mayor's after-hours presence inside the secured facility, as well as the timing and nature of the alarm activation and police response.

38. Rather than ensuring that this electronic evidence was preserved, reviewed, and evaluated as a potential security breach or ethics concern, senior Town officials and police leadership discouraged scrutiny, minimized the significance of the event, and took steps to avoid, delay, suppress, or control review of the available electronic evidence.

39. Based on his training, experience, and command-level responsibilities, Falzone reasonably believed that the Town Hall incident implicated serious concerns, including misuse of Town facilities, public safety risks, potential failures in police response and documentation, and erosion of public trust if the incident were concealed or mishandled.

40. Responding officers did not generate a standard incident report documenting a security breach, nor was the event treated as a criminal or administrative investigation.

**D. Protected Reporting and Escalation**

41. After identifying irregularities in both the Mayor's traffic stop and the Town Hall after-hours incident, Falzone raised concerns internally and sought legal guidance to ensure that the matters were handled lawfully, transparently, and in compliance with whistleblower protections.

42. On or about February 5, 2025, Falzone requested assistance from an IT employee, Jeff Noble, to locate missing body-worn camera footage and related metadata associated with the Mayor's traffic stop, and to preserve any associated audit data.

43. Shortly after Falzone initiated efforts to locate the missing evidence, Chief Campurciani confronted Falzone and stated, "You and I have a problem," while referencing the existence of a folder of allegations. The statement was made in a manner Falzone reasonably understood as a warning and as signaling hostility toward his efforts to investigate and document the incident.

44. The timing and context of this confrontation marked a clear shift in Falzone's treatment by senior leadership and coincided directly with his protected reporting activity.

45. Falzone also raised concerns to Town leadership regarding the Mayor traffic stop irregularities and the Town Hall after-hours incident.

**E. Manufactured Internal Affairs Complaint**

46. On or about March 25, 2025, the North Carolina Police Benevolent Association, through its staff representative Brandon McGaha, contacted Town Manager Tracey Jerome and Chief Campurciani by email stating that the organization had received information regarding possible employee retaliation for whistleblowing concerning Mayor Carney and a traffic stop. The email further stated that, if the information received was accurate, the matter appeared better suited for review by the North Carolina State Bureau of Investigation, including potential criminal violations such as willful failure to perform duties under N.C. Gen. Stat. § 14-230, and requested confirmation as to whether the SBI had been notified or was investigating. Despite this external notice from a statewide law-enforcement association, Defendants did not initiate an independent investigation into the Mayor's conduct or the alleged retaliation and instead continued to pursue disciplinary and Internal Affairs action against Falzone.

47. In April 2024, Chief Campurciani discussed with Falzone a minor policy question regarding whether an off-duty civil dispute involving Falzone should have been reported to the Chief.

In February 2025, within days of Falzone's request for assistance locating missing body-worn camera evidence, Chief Campurciani asserted that a citizen complaint had been received concerning that same off-duty civil dispute and used the matter as leverage to pressure Falzone to resign or face investigation and adverse employment action.

48. The January 2025 citizen complaint related to an incident from March 2024 that had already been addressed as a minor policy matter and closed without sustained findings or discipline.

49. Despite the absence of new evidence or intervening misconduct, Falzone was informed that this stale complaint would now serve as the basis for a new internal affairs investigation against him.

50. Based on the timing, the prior resolution of the complaint, and communications involving Town leadership, Falzone reasonably believed the complaint was encouraged, leveraged, or revived to manufacture a pretext for discipline and to create justification for his removal.

51. The Chief had previously addressed the Lyon matter with Falzone as a minor policy issue, with no discipline imposed. Chief Campurciani had never previously suggested that the Lyon matter warranted internal affairs investigation or disciplinary proceedings prior to Falzone's protected disclosures.

F. **Coercive Investigation and Administrative Leave**

52. Instead of investigating the Mayor's conduct or the irregularities Falzone identified, Defendants initiated an aggressive internal affairs investigation targeting Falzone himself.

53. On February 28, 2025, Falzone sat for a 3.5-hour interview with investigators from US ISS, during which he made disclosures detailing the suspected cover-up, manipulation of evidence, and misuse of authority by senior officials.

54. During the investigation, investigators discussed with Falzone an incident unrelated to the Mayor's conduct in which Chief Campurciani attended a political event for District Attorney

candidate Sarah Kirkman while driving a unmarked Department vehicle. Investigators indicated that this conduct by Chief Campurciani was "dead to rights" as a policy violation because appearing at a political function with a Department vehicle would violate Department policy and create the appearance of official endorsement. Falzone understood these comments to underscore the uneven and outcome-driven nature of the process.

55. Immediately following Falzone's protected disclosure and internal affairs interview, the posture of the Town and MPD shifted dramatically.

56. On the day following the internal affairs interview, and before any findings were made, Falzone was placed on administrative leave, stripped of meaningful authority, excluded from Department operations, and isolated from personnel and information necessary to perform his duties.

57. Falzone was denied meaningful notice of the specific charges against him, access to relevant evidence, and a neutral or independent decision-maker, depriving him of basic procedural protections.

58. Falzone was not provided copies of investigative materials, witness statements, or policy citations prior to being placed on leave. When Chief Campurciani confronted Falzone with the purported citizen complaint, Falzone immediately requested that the matter be opened as a formal Internal Affairs investigation and that an Internal Affairs case/file number be assigned pursuant to General Order 100.10. Campurciani had not assigned an IA file number and was proceeding without initiating a formal Internal Affairs investigation until Falzone demanded that the allegations be handled through the Department's official IA process. After meeting with ISS investigators, Falzone again formally requested, pursuant to General Order 100.10, to review the Internal Affairs investigative file upon the Town's receipt of ISS's completed investigation and requested the assigned Internal Affairs case number, but

13 of 36

Defendants failed and refused to provide him access to the investigative file or its contents, including transcripts, recordings, or notes of interviews of Chief Campurciani, Assistant Chief Rhonda Faust, and a civilian witness associated with Brad Lyon, despite the material relevance of those statements to the allegations against him.

**G. Forced Retirement**

59. Following Falzone's protected disclosures and cooperation with outside investigators, Falzone was placed on indefinite administrative leave while facing reputational harm, internal and external stigma, and escalating pressure from Town and Police Department leadership.

60. On February 6, 2025, Chief Campurciani summoned Falzone into his office, closed the door, and advised him that a citizen complaint had been received against him concerning a civil dispute that had occurred approximately ten months earlier and had already been addressed internally by the Chief in April 2024 as a minor policy matter.

61. The complaint had been delivered in sealed envelopes addressed to the Town Manager and Town Board members, but Chief Campurciani advised Falzone that the Town Manager had not yet provided the complaint to the Board, and that only the Chief, the Town Manager, and Falzone were aware of its existence at that time.

62. During this meeting, Chief Campurciani informed Falzone that, although he was "not suggesting anything," Falzone "might consider submitting [his] paperwork," referring to retirement. Chief Campurciani repeated this suggestion a second time during the same conversation, stating again that if there were "anything to" the complaint, Falzone should consider retiring.

63. Falzone understood these statements, in context, as an implicit threat that adverse disciplinary action would proceed if he did not retire, and that retirement was being used as a coercive mechanism to force his removal.

64. Falzone refused to retire and demanded a formal Internal Affairs investigation, stating he intended to prove the allegations false.

65. Thereafter, the Town and MPD created conditions under which Falzone had no realistic path to reinstatement or fair adjudication, including maintaining him on administrative leave, restricting his access to information, advancing a disciplinary process untethered from legitimate misconduct, and allowing stigmatizing allegations to circulate without a meaningful opportunity to clear his name.

66. Town representatives further conveyed, directly or indirectly, that if Falzone did not retire and discipline were imposed, his separation allowance and retirement benefits could be jeopardized.

67. On or about May 1, 2025, Falzone was forced to retire to protect his pension and livelihood. The retirement was not voluntary but was the foreseeable and intended result of Defendants' retaliatory conduct. As a result of Defendants' conduct, Falzone also lost the opportunity to continue earning salary, step increases, and additional credited service time toward supplemental retirement benefits that would have accrued had he remained employed.

68. Shortly after Falzone's retirement, Defendants demanded that Falzone surrender his police identification credentials, despite the fact that he had previously been issued a retiree identification card by the Department and had been authorized to possess such credentials. Defendants' demand to reclaim credentials that had already been issued to Falzone as a retiree was inconsistent with ordinary retiree practice and was undertaken as an additional act of punishment, harassment, and stigmatization in continuation of the retaliatory campaign against him.

### H. Municipal Policy, Custom, and Ratification

69. The actions taken against Falzone were not isolated or aberrational but were undertaken pursuant to official policies, customs, and practices of the Town of Mooresville. Those practices included retaliating against whistleblowers who reported misconduct by politically connected officials, suppressing or manipulating evidence implicating senior leadership, misusing internal affairs and disciplinary processes as tools of punishment, and ratifying retaliatory conduct through final policymakers, including the Town Manager and Chief of Police.

70. Through their actions and deliberate inaction, Defendants approved, condoned, and ratified the constitutional violations inflicted upon Falzone, rendering the Town liable for the resulting injuries.

71. The Town's ratification is further shown by its decision, on or about June 2024, to elevate Chief Campurciani into an expanded administrative role (including appointment as Assistant Town Manager) and to publicly praise that consolidation of authority. After the Town Hall after-hours incident surfaced in or about October 2024, and after the Mayor traffic stop and related body-worn camera/CAD irregularities surfaced in or about December 2024, the Town nevertheless left Campurciani in that enhanced position of authority over departments and systems central to records, facilities, and municipal operations, and took no meaningful steps to impose independent review or limit his control, thereby ratifying and endorsing the conduct and customs alleged herein.

## CLAIMS FOR RELIEF

### First Claim for Relief:
### First Amendment Retaliation (42 U.S.C. § 1983)
### (Against All Individual Defendants and Town of Mooresville)

72. Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

73. Plaintiff engaged in speech and expressive conduct protected by the First Amendment when he reported and opposed suspected governmental misconduct and irregularities involving the preservation, classification, and potential suppression of official records and electronic evidence concerning (a) the Mayor's late-night traffic stop and associated body-worn camera ("BWC") evidence/metadata, and (b) the Mayor's after-hours presence inside Town Hall and associated access-control, alarm, CAD, and surveillance evidence.

74. Plaintiff's protected activity included, among other things: a. receiving information from Captain Russell Clark regarding the Mayor's late-night traffic stop and documenting the report; b. reviewing and questioning the CAD classification and the absence of corresponding BWC footage in Axon despite activation metadata; c. requesting assistance from Town IT personnel (including Jeff Noble) to locate, preserve, and/or confirm the status of missing BWC footage and associated audit data; d. raising concerns about the apparent misclassification, disappearance, or inaccessibility of electronic evidence and the need for proper preservation and investigation; e. raising concerns regarding the Mayor's after-hours Town Hall incident and the handling of related access-control logs, alarm data, CAD records, and surveillance footage; f. communicating concerns to Town leadership, including the Town Attorney and Human Resources, regarding the integrity of records and the need for lawful investigative handling; and g. making protected disclosures and cooperating with outside investigators regarding suspected cover-up, misuse of authority, and retaliation.

75. Plaintiff's speech addressed matters of public concern, including public safety, the integrity of law enforcement operations, preservation of official evidence, accurate police recordkeeping (including CAD/BWC systems), abuse of power, and governmental accountability.

76. Plaintiff's protected speech was not limited to routine internal operational discussion or ordinary job duties. Plaintiff engaged in speech and disclosures that extended beyond ordinary job duties and chain-of-command, including communications to Town leadership outside the police chain, legal/HR channels, and cooperation with outside investigators, in order to ensure lawful handling and investigation of suspected misconduct and evidence irregularities.

77. Defendants knew of Plaintiff's protected activity. Plaintiff's evidence-location requests, concerns regarding CAD/BWC irregularities, and subsequent disclosures were communicated to and/or became known to Chief Campurciani, Town Manager Jerome, and others acting in concert with them.

78. Shortly after Plaintiff engaged in protected activity, Defendants subjected Plaintiff to materially adverse actions, including but not limited to: a. hostility and confrontation by Chief Campurciani following Plaintiff's evidence-location efforts, including summoning Plaintiff to a closed-door meeting and stating in substance that "because of this, you and I have a problem," while referencing a folder of allegations; b. reviving and weaponizing a stale, previously addressed citizen complaint as a pretext for discipline; c. initiating and pursuing a punitive Internal Affairs process targeting Plaintiff rather than investigating the underlying evidence irregularities Plaintiff raised; d. stripping Plaintiff of meaningful authority and responsibilities and restricting access to information necessary to perform his role; e. placing Plaintiff on administrative leave and isolating him from MPD operations; f. permitting the circulation of stigmatizing allegations and insinuations of misconduct without a meaningful, neutral opportunity to clear his name; and g. escalating coercive pressure that culminated in Plaintiff's involuntary retirement under threat to earned benefits.

79. These actions, individually and collectively, would chill a person of ordinary firmness from engaging in protected speech concerning governmental misconduct and evidence integrity.

80. Plaintiff's protected activity was a substantial and motivating factor in Defendants' retaliatory actions, as shown by, among other things: a. the close temporal proximity between Plaintiff's evidence-location request(s) and the Chief's hostile confrontation and initiation of a retaliatory pathway; b. the sudden resurrection of a previously addressed complaint shortly after Plaintiff's protected activity; c. departures from ordinary investigative fairness and neutrality, including advancing discipline untethered from legitimate performance concerns while minimizing the underlying evidence-integrity concerns Plaintiff reported; d. escalating pressure on Plaintiff to leave employment following his refusal to abandon his concerns; and e. the sequence of actions leading from protected disclosures to administrative leave and forced retirement.

81. Defendants' stated reasons for targeting Plaintiff were pretextual and were used to punish Plaintiff for engaging in protected speech and to deter further disclosures.

82. Defendants acted intentionally, willfully, and/or with reckless disregard for Plaintiff's clearly established First Amendment rights.

83. As a direct and proximate result of Defendants' conduct, Plaintiff suffered loss of employment, loss of wages and benefits, impairment of career prospects, reputational harm, emotional distress, and other compensatory damages in an amount to be determined by the jury.

### Second Claim for Relief:
### Fourteenth Amendment Due Process – Stigma-Plus – 42 U.S.C. § 1983
### (Against All Individual Defendants and Town of Mooresville)

84. Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

85. Defendants made, authorized, and disseminated false and stigmatizing statements and accusations concerning Plaintiff's honesty, integrity, professionalism, and alleged policy violations, including portraying Plaintiff as having engaged in serious misconduct warranting discipline.

86. These stigmatizing accusations included, among other things, allegations arising from a resurrected citizen complaint previously addressed as a minor policy issue, insinuations that Plaintiff engaged in serious misconduct warranting discipline, and official actions implying Plaintiff's unfitness for continued service, including administrative leave, isolation, and a coerced separation.

87. The stigmatizing statements and accusations were communicated within MPD, to Town leadership, through official Internal Affairs and investigative channels, and to individuals involved in employment and disciplinary decision-making.

88. The stigmatizing statements were made in connection with, and as part of, Defendants' decision to place Plaintiff on administrative leave, strip him of authority, and force his separation from employment.

89. Defendants altered Plaintiff's legal status by effectively terminating him through constructive discharge and forcing him into involuntary retirement under threat to his earned benefits.

90. Plaintiff repeatedly requested a fair and formal Internal Affairs process and sought an opportunity to prove the allegations false.

91. Plaintiff was never provided a meaningful name-clearing hearing before a neutral decision-maker at which he could confront the allegations, review evidence, present witnesses, and clear his name.

92. Plaintiff was denied adequate notice of specific charges, denied access to the evidence against him, and denied a meaningful opportunity to be heard prior to or in connection with his constructive discharge.

93. As a result of Defendants' actions, Plaintiff was deprived of liberty interests in his reputation, honor, and future employment prospects, and property interests in continued public employment and accrued retirement benefits, without due process of law.

94. Defendants acted under color of state law, and their conduct was intentional, willful, and/or in reckless disregard of Plaintiff's clearly established Fourteenth Amendment rights.

95. Plaintiff suffered damages as a direct and proximate result of Defendants' unconstitutional conduct.

**Third Claim for Relief:**
**Fourteenth Amendment Procedural Due Process – Property Interest – 42 U.S.C. § 1983**
**(Against All Individual Defendants and Town of Mooresville)**

96. Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

97. Plaintiff possessed constitutionally protected property interests in his continued public employment with the Mooresville Police Department, his rank and position as Assistant Chief of Police, and his accrued retirement, pension, and separation benefits.

98. Defendants deprived Plaintiff of these protected property interests by placing him on administrative leave, stripping him of his authority and duties, advancing a predetermined disciplinary process, and coercing him into involuntary retirement.

99. Plaintiff was not provided, prior to these deprivations, with: a. Timely and specific notice of the charges against him; b. Disclosure of the evidence purportedly supporting those charges; c. A meaningful opportunity to confront the allegations; d. A meaningful opportunity to

present witnesses and evidence in his defense; e. A hearing before a neutral and unbiased decision-maker; or f. Any pre-deprivation hearing.

100.      Plaintiff was likewise not provided a meaningful post-deprivation hearing capable of restoring his employment, clearing his record, or protecting his accrued benefits.

101.      Defendants' failure to provide basic procedural safeguards was intentional and undertaken pursuant to a course of conduct designed to force Plaintiff's removal rather than to adjudicate any legitimate misconduct.

102.      As a result of Defendants' actions, Plaintiff was deprived of property without due process of law, in violation of the Fourteenth Amendment.

103.      Plaintiff suffered damages as a direct and proximate result of Defendants' unconstitutional conduct.

**Fourth Claim for Relief:**
**Municipal Liability (Monell) – 42 U.S.C. § 1983**
**(Against Town of Mooresville)**

104.      Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

105.      Plaintiff's constitutional injuries were caused by, resulted from, and were the foreseeable consequence of official policies, longstanding customs, practices, and usages of the Town of Mooresville.

106.      These municipal policies, customs, and practices include, but are not limited to: a. A custom and practice of protecting politically connected officials and senior command staff from criminal, administrative, or ethics-based investigation; b. A custom and practice of suppressing, manipulating, misclassifying, deleting, restricting access to, or otherwise rendering inaccessible electronic evidence, including body-worn camera recordings, CAD entries, access-control logs, alarm data, and surveillance footage, when such evidence

implicates senior Town officials; c. A custom and practice of retaliating against employees, including command-level law enforcement officers, who report misconduct by Town leadership or refuse to participate in cover-ups; d. A custom and practice of using Internal Affairs investigations, disciplinary processes, and administrative leave as punitive and retaliatory tools rather than as neutral fact-finding mechanisms; e. A policy or custom of permitting the Police Chief to exercise unchecked control over Internal Affairs investigations involving himself, the Mayor, or matters in which he has a personal stake; f. A policy or custom of concentrating investigative, disciplinary, and administrative authority in officials who are themselves implicated in the underlying misconduct, including Chief Campurciani's simultaneous service as Police Chief and Assistant Town Manager with oversight of departments responsible for records, facilities, and municipal systems; g. A failure to train, supervise, and discipline Town employees regarding whistleblower protections, evidence preservation, and constitutional limits on retaliation; and h. A failure to establish or enforce independent review mechanisms for allegations involving senior Town officials.

107.      These policies, customs, and practices were widespread, persistent, and so well settled as to constitute the functional equivalent of official municipal policy.

108.      Final policymakers for the Town of Mooresville, including Defendant Tracey Jerome (Town Manager) and Defendant Ron Campurciani (Chief of Police and Assistant Town Manager), possessed final authority over personnel decisions, internal investigations, discipline, and administrative leave and exercised that authority in connection with the acts alleged herein.

109.      Defendant Jerome and Defendant Campurciani personally authorized, directed, participated in, approved, and ratified the retaliatory investigation, administrative leave, stigmatization, and coerced retirement of Plaintiff.

110.     The Town further ratified the unconstitutional conduct by: a. Failing to intervene to stop the retaliation after being placed on notice of Plaintiff's protected disclosures; b. Continuing to pursue discipline against Plaintiff rather than investigating the Mayor's conduct; c. Maintaining Plaintiff on administrative leave without due process; and d. Publicly announcing and praising Defendant Campurciani's expanded administrative role after the Mayor traffic stop despite unresolved evidence irregularities and allegations of supervisory misconduct.

111.     The Town's policies, customs, practices, and ratification were the moving force behind the violation of Plaintiff's First and Fourteenth Amendment rights.

112.     As a direct and proximate result of these municipal policies, customs, and practices, Plaintiff suffered the injuries and damages alleged herein.

### Fifth Claim for Relief:
### Civil Conspiracy – 42 U.S.C. § 1983
### (Against Individual Defendants)

113.     Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

114.     At all relevant times, Defendants Chris Carney, Ron Campurciani, and Tracey Jerome reached an agreement, understanding, or meeting of the minds to retaliate against Plaintiff for his protected disclosures and to suppress, conceal, and neutralize information concerning misconduct by senior Town officials.

115.     The object of the conspiracy was to: a. Prevent disclosure of evidence irregularities concerning the Mayor's traffic stop and the Mayor's after-hours presence inside Town Hall; b. Shield the Mayor and Chief from scrutiny, discipline, or criminal exposure; c. Discredit Plaintiff as a witness and whistleblower; d. Remove Plaintiff from his position of authority; and e. Deter other employees from reporting misconduct.

116.     Defendants shared knowledge of Plaintiff's protected disclosures, including his requests to locate missing body-worn camera evidence, his concerns regarding misclassified CAD records, his inquiries into access-control and surveillance data, and his communications with Town leadership and outside investigators.

117.     Following Plaintiff's disclosures, Defendants engaged in coordinated and interdependent actions demonstrating a meeting of the minds, including: a. Defendant Campurciani confronting Plaintiff and expressing hostility toward Plaintiff's investigation efforts; b. Defendant Jerome participating in or approving the revival of a previously resolved citizen complaint as a disciplinary vehicle; c. Defendants allowing or encouraging that stale complaint to be routed in sealed envelopes to senior Town officials; d. Defendants directing that Internal Affairs resources be focused on Plaintiff rather than on the Mayor-related incidents; e. Defendants maintaining Plaintiff on administrative leave without due process; f. Defendants permitting stigmatizing allegations to circulate internally; g. Defendants pressuring Plaintiff to retire while withholding any legitimate exculpatory process; and h. Defendants praising and expanding Defendant Campurciani's authority after the underlying incidents.

118.     These actions were not isolated or coincidental but were logically connected, mutually reinforcing, and temporally linked to Plaintiff's protected activity.

119.     Each Defendant knew of the conspiracy's unlawful objectives and knowingly participated in acts intended to advance those objectives.

120.     Defendants committed numerous overt acts in furtherance of the conspiracy, including but not limited to: a. Suppressing, restricting, or failing to preserve electronic evidence; b. Misclassifying records; c. Manufacturing or reviving disciplinary allegations; d. Initiating a punitive Internal Affairs investigation; e. Placing Plaintiff on administrative leave;

f. Communicating coercive retirement suggestions; g. Withholding procedural protections; and h. Ratifying each other's actions.

121.     Defendants' conspiratorial acts were taken under color of state law.

122.     Defendants' conspiratorial acts were the direct and proximate cause of Plaintiff's constructive discharge, reputational injury, loss of income and benefits, emotional distress, and deprivation of constitutional rights.

123.     The conspiracy was ongoing and continuous, extending from at least February 2025 through Plaintiff's forced retirement in May 2025.

124.     Because Defendants acted in concert pursuant to a common plan, each Defendant is liable for the acts of the others committed in furtherance of the conspiracy.

### Sixth Claim for Relief:
### Wrongful Discharge in Violation of North Carolina Public Policy

125.     Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

126.     North Carolina recognizes a common-law cause of action for wrongful discharge in violation of public policy where an employee is terminated for reasons that contravene the State's clearly expressed public policy. *Coman v. Thomas Mfg. Co., Inc.*, 325 N.C. 172, 175–76, 381 S.E.2d 445 (1989).

127.     The North Carolina Supreme Court has repeatedly held that an employer may not discharge an employee for reasons that violate public policy, including where an employee is terminated because he refused to violate the law, refused to engage in unlawful or unethical conduct, reported illegal or improper conduct, or acted in furtherance of statutory or constitutional protections. *Coman*, 325 N.C. at 175–76; *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 353–54, 416 S.E.2d 166 (1992); *Garner v. Rentenbach Constructors Inc.*, 350 N.C. 567,

571–72, 515 S.E.2d 438 (1999); *Kurtzman v. Applied Analytical Indus., Inc.*, 347 N.C. 329, 334–35, 493 S.E.2d 420 (1997).

128.     The public-policy exception applies with particular force where an employee is punished for attempting to expose wrongdoing or refusing to participate in unlawful or unethical conduct. *Sides v. Duke Univ.*, 74 N.C. App. 331, 342–44, 328 S.E.2d 818 (1985).

129.     North Carolina has a strong and well-established public policy favoring honest and impartial law enforcement, preservation of public records and evidence, prohibition of obstruction of justice, government transparency and accountability, protection of whistleblowers, and integrity in criminal investigations and prosecutions.

130.     These public policies are reflected in, among other sources, N.C. Gen. Stat. § 14-225 (obstruction of justice), N.C. Gen. Stat. § 132-1 et seq. (Public Records Act), N.C. Gen. Stat. § 15A-268 et seq. (preservation of evidence), Article I, Sections 18 and 19 of the North Carolina Constitution, and the common-law duties imposed upon sworn law-enforcement officers to report crimes and misconduct.

131.     Terminating a senior police official for attempting to preserve evidence, report manipulation of records, and ensure lawful investigations directly contravenes these clearly expressed public policies.

132.     Plaintiff engaged in conduct protected by North Carolina public policy when he received and documented information concerning the Mayor's late-night traffic stop involving body-worn camera activation, reviewed CAD classifications and body-worn camera metadata, requested preservation and retrieval of missing body-worn camera footage and audit logs, reported suspected deletion, misclassification, and suppression of electronic evidence, became aware of and identified serious concerns regarding the Mayor's after-hours presence inside a secured municipal building and the handling of related surveillance video,

27 of 36

alarm data, and access-control logs, communicated concerns to Town leadership, Human Resources, and the Town Attorney, disclosed suspected cover-up and misuse of authority to outside and external investigators, filed an EEOC charge and received a Notice of Right to Sue, and insisted that these matters be investigated lawfully.

133.     Plaintiff further refused to engage in conduct that would violate North Carolina law, including participating in obstruction of justice, assisting in falsification or misclassification of public records, concealing or destroying public records, and misusing Internal Affairs processes as a retaliatory tool.

134.     Plaintiff's conduct constitutes precisely the type of whistleblowing and refusal to commit unlawful acts that North Carolina public policy is designed to protect.

135.     Defendants had actual knowledge of Plaintiff's protected conduct through Plaintiff's direct interactions with other employees, Plaintiff's documented request to IT employee Jeff Noble to locate missing video, Plaintiff's communications with Human Resources and the Town Attorney, Plaintiff's cooperation with outside investigators, Plaintiff's administrative interview with ISS investigators, and Plaintiff's EEOC charge and related communications.

136.     After learning of Plaintiff's protected conduct, Defendants did not investigate the misconduct Plaintiff reported but instead initiated a coordinated retaliatory campaign against Plaintiff.

137.     Defendants seized upon and later re-characterized as a "citizen complaint" a private, non-law-enforcement civil dispute involving Plaintiff in his personal capacity related to the servicing and repair of his boat. Although Chief Campurciani had previously been made aware of the matter and it had been treated as a minor, resolved personal issue rather than a disciplinary complaint, Defendants later repackaged the dispute as a formal citizen complaint and used it as a pretext to initiate a punitive Internal Affairs process targeting Plaintiff rather

than the reported misconduct. Defendants then portrayed Plaintiff as having committed serious policy violations, stripped Plaintiff of meaningful authority and responsibilities, isolated Plaintiff from personnel and information, placed Plaintiff on administrative leave, and circulated stigmatizing accusations. As the retaliation escalated in February 2025 and thereafter, Defendants further pressured Plaintiff to separate from employment, including by suggesting retirement and implying his benefits could be jeopardized.

138.     Defendants deliberately created working conditions so intolerable that a reasonable person in Plaintiff's position would feel compelled to resign.

139.     Plaintiff's retirement therefore constituted a constructive discharge under North Carolina law. *Whitt v. Harris Teeter, Inc.*, 359 N.C. 625, 614 S.E.2d 531 (2005).

140.     Plaintiff's protected conduct was a substantial and motivating factor in Defendants' decision to force him from employment.

141.     Causation is demonstrated by close temporal proximity between Plaintiff's disclosures and retaliatory actions, direct hostile statements by Chief Campurciani immediately after Plaintiff sought missing video, sudden resurrection of dormant complaints, deviations from normal disciplinary practice, and escalating pressure to retire after Plaintiff refused to withdraw or abandon his complaints.

142.     Defendants' stated reasons for discipline were pretextual and manufactured to conceal retaliation.

143.     But for Plaintiff's protected whistleblowing and refusal to participate in unlawful conduct, Plaintiff would not have been forced from employment.

144.     Terminating a senior police official for attempting to preserve evidence, report misconduct, and insist upon lawful investigation violates the clearly expressed public policy of North Carolina.

145.     Defendants' conduct therefore constitutes wrongful discharge in violation of North
Carolina public policy.

146.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has
suffered loss of salary and future earnings, loss of retirement accruals and employment
benefits, loss of career and professional standing, damage to reputation, emotional distress,
anxiety, humiliation, and mental anguish, out-of-pocket expenses, and other compensatory
damages to be proven at trial.

147.     Defendants' conduct was willful, malicious, oppressive, and undertaken with
conscious and reckless disregard for Plaintiff's rights, entitling Plaintiff to punitive damages
under North Carolina law.

**Seventh Claim for Relief:**
**North Carolina Whistleblower Act – N.C. Gen. Stat. § 126-84 et seq.**
**(Against Town of Mooresville)**

148.     Plaintiff incorporates by reference and realleges each and every allegation contained
in the preceding paragraphs of this Complaint as if fully set forth herein.

149.     The North Carolina Whistleblower Act ("NCWA"), N.C. Gen. Stat. § 126-84 et seq.,
embodies the public policy of the State of North Carolina to encourage public employees to
report improper governmental activities and to protect those employees from retaliation for
doing so.

150.     The NCWA prohibits a state or local governmental employer from taking retaliatory
action against an employee because the employee, in good faith, reports or is about to report
improper governmental activity to an appropriate authority. N.C. Gen. Stat. §§ 126-84, 126-
85.

151.     "Improper governmental activity" under the NCWA includes conduct by a
governmental entity or official that violates state or federal law, constitutes fraud,

misappropriation, gross mismanagement, or abuse of authority, or creates a substantial and specific danger to public health or safety. N.C. Gen. Stat. § 126-84(5).

152.     The NCWA is remedial legislation and must be liberally construed to effectuate its purpose of encouraging public employees to disclose wrongdoing without fear of reprisal. *Newberne v. Dep't of Crime Control & Pub. Safety*, 359 N.C. 782, 787, 618 S.E.2d 201 (2005).

153.     To establish a claim under the NCWA, a plaintiff must show that he was a public employee, that he made a good-faith report of improper governmental activity, that the employer took retaliatory action against him, and that a causal connection exists between the protected report and the adverse action. *Newberne*, 359 N.C. at 786–87; *Wiley v. United Parcel Serv., Inc.*, 164 N.C. App. 183, 187, 594 S.E.2d 809 (2004).

154.     At all relevant times, Plaintiff was a public employee of the Town of Mooresville, serving as Assistant Chief of Police, and therefore fell squarely within the class of employees protected by the NCWA. In the alternative, Plaintiff pleads this claim to the extent the NCWA is construed to apply to local governmental employers and their employees.

155.     Plaintiff, acting in good faith and with a reasonable belief that wrongdoing had occurred, reported improper governmental activities involving senior Town and police officials, including suspected manipulation, deletion, and suppression of body-worn camera recordings and audit logs related to a late-night traffic stop involving the Mayor; misclassification of CAD entries to disguise the true nature of that stop; suspected supervisory involvement in controlling the handling of the incident; the Mayor's after-hours presence inside a secured municipal building; mishandling and suppression of surveillance footage, alarm data, and access-control records; and the misuse of Internal Affairs processes to shield politically connected individuals from scrutiny while targeting the reporting official.

156.    Plaintiff further engaged in protected activity by requesting the preservation and retrieval of missing electronic evidence, insisting upon lawful investigation of the reported misconduct, cooperating with internal and external investigators, and refusing to participate in suppression, concealment, or mischaracterization of public records and evidence.

157.    The conduct reported by Plaintiff constituted "improper governmental activity" within the meaning of N.C. Gen. Stat. § 126-84(5) because it involved suspected violations of law, abuse of authority, gross mismanagement, and conduct posing a substantial and specific danger to public trust, public safety, and the integrity of law enforcement operations.

158.    Plaintiff made his reports through channels expressly authorized by both state law and Town policy, including communications with Town leadership, Human Resources, and the Town Attorney; documented requests to Town IT personnel to locate, preserve, and confirm missing evidence; cooperation with internal and external investigators; and participation in formal investigative interviews.

159.    At all relevant times, the Town of Mooresville maintained an official Whistleblower Protection Policy, Administrative Policy AP-ADM-011, which expressly prohibits retaliation against employees who make protected disclosures concerning matters of public concern, including violations of law, abuse of authority, gross mismanagement, and dangers to public health or safety

160.    The Town's Whistleblower Policy defines "protected disclosure" broadly, prohibits adverse personnel actions taken in response to such disclosures, and requires that reported matters be investigated rather than suppressed, thereby reinforcing and incorporating the protections afforded by the NCWA.

161.     Plaintiff's disclosures fell squarely within the scope of "protected disclosures" under both the NCWA and the Town's own Whistleblower Policy, and Plaintiff fully complied with the reporting procedures set forth in that policy.

162.     Defendants, including Town decision-makers acting on behalf of the Town of Mooresville, had actual knowledge of Plaintiff's whistleblowing activity through Plaintiff's repeated reports, documented evidence requests, investigative interviews, and related communications.

163.     Rather than investigate the reported misconduct, Defendants subjected Plaintiff to retaliatory action within the meaning of N.C. Gen. Stat. § 126-85, including reviving a stale and previously resolved civil dispute, initiating a punitive Internal Affairs investigation against Plaintiff, stripping Plaintiff of authority and responsibilities, isolating Plaintiff from personnel and information, placing Plaintiff on administrative leave, circulating stigmatizing accusations, repeatedly pressuring Plaintiff to submit retirement paperwork, and warning Plaintiff that his benefits were at risk if he did not do so.

164.     These actions constituted materially adverse employment actions and significant changes in working conditions that would dissuade a reasonable employee from engaging in protected whistleblowing activity.

165.     Defendants deliberately created working conditions so intolerable that a reasonable person in Plaintiff's position would feel compelled to resign, and Plaintiff's resulting retirement therefore constituted a constructive discharge.

166.     A causal connection exists between Plaintiff's protected whistleblowing activity and Defendants' retaliatory actions, as demonstrated by the close temporal proximity between Plaintiff's reports and the initiation of Internal Affairs proceedings, direct hostility expressed by the Chief of Police immediately after Plaintiff sought missing evidence, the sudden

resurrection of dormant complaints, departures from normal investigative and disciplinary practices, and escalating pressure on Plaintiff to retire after he refused to abandon his reports.

167.     Defendants' asserted reasons for their actions were false, pretextual, and manufactured to conceal retaliation for Plaintiff's protected whistleblowing activity.

168.     But for Plaintiff's protected disclosures and refusal to participate in unlawful or improper conduct, Defendants would not have taken adverse action against him or forced him from employment.

169.     As a direct and proximate result of Defendants' violations of the North Carolina Whistleblower Act, Plaintiff has suffered loss of salary and future earnings, loss of retirement accruals and employment benefits, loss of career and professional standing, damage to reputation, emotional distress, anxiety, humiliation, mental anguish, out-of-pocket expenses, and other compensatory damages to be proven at trial.

170.     Plaintiff is entitled to all relief available under the North Carolina Whistleblower Act, including compensatory damages, injunctive relief, reinstatement or front pay, and reasonable attorneys' fees and costs pursuant to N.C. Gen. Stat. § 126-87.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, and grant the following relief:

1. Plaintiff hereby requests that this pleading be accepted as an affidavit for all purposes permitted by law.

2. Declaratory relief declaring that Defendants' acts, omissions, policies, customs, and practices violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, the North Carolina Constitution, the North Carolina

Whistleblower Act, and North Carolina public policy, and that such acts and practices are unconstitutional and unlawful;

3. Compensatory damages against all Defendants, jointly and severally, for lost wages, lost benefits, loss of earning capacity, loss of retirement and pension benefits, back pay, emotional distress, mental anguish, humiliation, reputational harm, and other injuries, in an amount to be determined by a jury;

4. Punitive damages against the individual Defendants for their willful, malicious, and reckless disregard of Plaintiff's federally protected rights;

5. Injunctive relief, including but not limited to: a. A prompt and meaningful name-clearing hearing; b. Correction, expungement, sealing, or annotation of adverse personnel records; and c. An order prohibiting further retaliation against Plaintiff for engaging in protected activity;

6. Attorneys' fees and costs pursuant to 42 U.S.C. § 1988, N.C. Gen. Stat. § 126-87, and other applicable law;

7. Pre-judgment and post-judgment interest as allowed by law;

8. Plaintiff demands a trial by jury on all issues so triable; and

9. Any and all other relief as the Court deems just, proper, and appropriate.

Dated: February 9, 2026       *Counsel for Plaintiff*       /s C. Christopher Adkins
N.C. Bar No. 46950
Adkins Law, PLLC
9620 Sherrill Estates Road
Huntersville, North Carolina 28078
Phone: (704) 274-5677
Fax: (877) 208-7577
chris@huntersvillelawyer.com

/s Christerfer R. Purkey
N.C. Bar No. 53584
Rech Law, P.C.
18125 W. Catawba Avenue
Cornelius, North Carolina 28031

(704) 228-2790 phone
(704) 909-7410 fax
cpurkey@rechlaw.com
*Admission in W.D.N.C. pending

*** <u>Verification Page to Follow</u> ***

## VERIFICATION

I, **Frank Falzone**, being duly sworn, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Complaint and know the contents thereof; that the factual allegations contained therein are true and correct to the best of my knowledge, information, and belief; and that the matters stated upon information and belief are believed by me to be true.

Executed on this ___9___ day of February, 2026.

**Frank Falzone**

STATE OF NORTH CAROLINA

COUNTY OF _Mecklenburg_

Subscribed and sworn to (or affirmed) before me this _9th_ day of February, 2026, by **Frank Falzone**, who is personally known to me or who has produced _Drivers License_ as identification.

Notary Public

My Commission Expires: _Aug. 16, 2028_

CHARLES CHRISTOPHER ADKINS
Notary Public
North Carolina
Mecklenburg County

[Notary Seal]